# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**PAIGE M. WINTER,**

        **Plaintiff,**

  v.                                       Case No. 06-C-253

**HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY and GROUP
LONG TERM DISABILITY PLAN FOR
EMPLOYEES OF DONALDSON
COMPANY, INC.,**

        **Defendants.**

## DECISION AND ORDER

Paige Winter ("Winter") brought this action against Hartford Life & Accident Insurance Company ("Hartford") and Group Long Term Disability Plan for Employees of Donaldson Company, Inc. (the "Plan") (collectively the "Defendants"). Winter alleges that the Defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA") by denying her long-term disability benefits. The Defendants and Winter filed cross motions for summary judgment, which are currently pending before the Court.

**BACKGROUND**

Beginning in March 1998, Winter worked as a human resources manager for Donaldson Company ("Donaldson"). (R. 467.) Donaldson is located in Stevens Point, Wisconsin, which is a 57-mile commute from Winter's home in Oxford, Wisconsin. (R. 435.) On August 30, 1998, Winter injured herself when she fell three to four feet and landed on the ground during a company picnic. (R. 489.) Approximately ten days later, she began seeking medical treatment for her injury, and continued working continuously at Donaldson until she took maternity leave in 2000. (*Id*.) She returned to work from her maternity leave in March 2001, but by May 2001, she experienced "gradually increased neck pain" and back spasms. (R. 490, 494.)

In February 2002, Winter saw an orthopaedic specialist, Dr. Michael Plooster, for an evaluation of her neck and upper back problems. (R. 435.) Dr. Plooster concluded that Winter's "symptoms are a mixed bag involving both axial neck pain as well as upper back and shoulder pain." (R. 436.) Dr. Plooster ordered an MRI and bone scan. (*Id*.)

While on her way to her bone scan appointment in early March 2002, Winter was involved in a car accident. (R. 433.) Shortly thereafter, on March 6, 2002, Dr. Plooster noted that Winter had "accelerated pain into her neck." (*Id*.) In addition, Dr. Plooster reported that Winter suffered from headaches that radiate to her forehead, some throbbing pain, and trouble reaching overhead. (*Id*.) However, x-rays demonstrated that she did not have a "fracture dislocation or other bone problem other than the degenerative segment at

2

C6-7 which (was) unchanged from her previous x-ray." (*Id*.) As a result of her accident, Winter received two weeks off from work on paid leave.

Winter returned to work at the end of March 2002, but she left again on April 2, 2002. (R. 470.) Over one month later, on May 7, 2002, Winter told Dr. Plooster that she could not work "due to the fact that she cannot drive, or deal with the stress of her job, given her current physical complaint." (R. 428.) Dr. Plooster observed that her "neck range of motion is not significantly limited," and he asked her to return in three weeks "with a plan of returning to work sometime soon thereafter." (*Id*.)

Winter filed a claim for worker's compensation benefits from Donaldson, and Dr. James G. Gmeiner, an orthopedic surgeon, performed a medical examination on May 16, 2002. Dr. Gmeiner concluded that Winter did not "have any objective findings on her physical examination that would indicate a need for vocational and avocational restrictions." (R. 498.) Accordingly, Donaldson did not grant worker's compensation benefits to Winter.

Subsequently, in September 2002, Winter applied for long-term disability benefits from Hartford. (R. 467-470.) Upon receiving Winter's application, Hartford requested medical records from Dr. Plooster. (R. 421.) These records indicated that Dr. Plooster had referred Winter to a number of other doctors, so Hartford also requested records from the physicians to whom Winter had been referred. (R. 404, 422.) Winter had been referred to Dr. Kenneth Oh and Dr. Russell Gelfman.

3

Dr. Oh examined Winter on June 3, 2002. (R. 422.) Winter asked Dr. Oh to complete a physician's statement regarding her disability claim with Hartford, which Dr. Oh agreed to do. (R. 426.) He indicated that Winter was unable "to drive the one hour to work." (*Id*.) However, he believed she could "do the Human Resources Manager job itself" because she "could stop every 20-30 minutes to do some range of motions to the neck before onset of discomfort . . . ." (*Id*.)

On September 3, 2002, Winter consulted Dr. Gelfman for an evaluation of her disability claim. Dr. Gelfman found that Winter suffered from several limitations. (R. 477.) Specifically, he found that she needed to change positions every 15-20 minutes, she could not reach or work overhead, she could not repetitively push or pull, and she could not drive more than 15-20 minutes. (*Id*.) Dr. Gelfman thought those limitations would last about 1-2 years. (*Id*.)

On March 7, 2003, Hartford granted Winter's claim for disability benefits. (R. 329.) However, the benefits were only authorized through April 4, 2003, the date of her next office visit with Dr. Gelfman. (*Id*.) Hartford then sent Dr. Gelfman a physical capacities evaluation form, which asked him to identify specific physical or psychological restrictions on Winter's functionality. (R. 323.) Hartford asked Dr. Gelfman to "make sure to respond to ALL portions of the form." (R. 325) (emphasis in the original.)

On April 17, 2003, Dr. Gelfman returned the physical capacities evaluation form, but he left blank the section of the form that asked how many hours Winter could sit, stand, walk

4

or drive in an eight-hour workday. (R. 319.) Dr. Gelfman did indicate that Winter could occasionally lift and carry up to 20 pounds, and could stoop, kneel, or crouch occasionally as well. (R. 319.) Winter's job description only required her to lift up to 10 pounds "occasionally" and never required her to stoop, knee, or crouch. (R. 438.)

Dr. Gelfman also found that Winter could never reach above her shoulder level and only occasionally reach at waist level and below waist level. (R. 320.) She also, according to Dr. Gelfman, could only occasionally engage in "handling" or "fingering," and was unable to repetitively use her right or left hand. (*Id*.) Winter's job demanded that she engage in "reaching," "fingering," and "handling" frequently. (R. 438.) Nevertheless, Dr. Gelfman concluded that Winter could "return to work in a lighter duty capacity" immediately so long as it is a "low stress environment." (R. 320.)

On May 1, 2003, Hartford terminated Winter's claim. (R. 309-317.) Hartford explained that Winter must submit updated proof of her disability that would establish her eligibility for benefits. (R. 317.) Specifically, Hartford requested "objective physical and/or psychiatric examination findings by a licensed physician and/or psychiatrist, which indicate you are unable to perform the essential duties of your occupation as a Human Resources Manager." (*Id.*)

On May 19, 2003, psychologist Dr. Douglas Varvil-Weld, PhD., completed a psychological evaluation of Winter. (R. 293-296.) He concluded that Winter's "symptom picture" was "suggestive of a possible Depressive Disorder," but that she had no impairment

5

in her ability to concentrate, carry out directions, or work effectively with others. (R. 296.) Hartford received Dr. Varvil-Weld's evaluation on September 24, 2003. (R. 52.)

On the same day, September 24, 2003, Hartford received a letter from Dr. John McCartney. Dr. McCartney opined that Winter was unable to stay gainfully employed at her job due to the "combination of chronic fibromyalgia, chronic cervical neck pain, and depression." (R. 298.)

On January 15, 2004, Dr. Todd Lyons submitted a medical report to Hartford in which he evaluated all of Winter's medical records. (R. 246-254.) Dr. Lyons concluded that Winter "is capable of at least full-time sedentary demand work." (R. 254.) He added that there "appears to be no evidence that she is impaired in her ability to ambulate and so a closer estimate of her work capacity is likely to be sedentary to light demand work." (*Id*.) Dr. Lyons also said that her work must entail certain restrictions and limitations. Winter could not engage in any "prolonged overhead work with the upper extremity, no lifting greater than 10 lbs. occasionally and no maintenance of prolonged hyperextensive cervical postures." (*Id*.) Dr. Lyons believed Winter had "no restrictions" in her capacity for "sitting, frequent ambulation, frequent standing," and that she has the ability for "occasional stooping, bending and squatting." (*Id*.)

When preparing his medical report, Dr. Lyons spoke with Dr. McCartney. During this conversation, Dr. McCartney reportedly agreed that Winter could perform full-time sedentary demand work so long as she avoided prolonged overhead work. (R. 242.) Dr. Lyons then

6

sent Dr. McCartney a letter summarizing their conversation, including Dr. McCartney's opinion that Winter could perform full-time sedentary demand work. (R. 242-243.) Dr. Lyon also asked Dr. McCartney in the letter to respond within five business days if anything in the letter was incorrect. (R. 243.) Dr. McCartney did not respond.

After receiving Dr. Lyon's report, Hartford affirmed its termination of Winter's benefits because it found that she did not provide satisfactory proof that she was unable to perform the essential duties of her job. (R. 233-240.) Hartford explained its decision in an 8-page letter in which Hartford quoted at length from the records of Drs. Oh, McCartney, Gelfman, and Varvil-Weld. (R. 234-237.) Hartford also quoted from Dr. Lyon's review. (R. 237-238.)

On July 6, 2004, Winter appealed Hartford's determination. In support of her appeal, she provided a letter from Dr. McCartney, in which he told Winter that "it is doubtful you could be an effective employee." (R. 220.) She also included a medical evaluation by Dr. Jerome Lerner, who examined Winter at her attorney's request. (R. 213.) Dr. Lerner concluded that due to her "severe intermittent headaches," she is "unreliable with regard to being able to function on a daily basis at work." (R. 219.)

After receiving these records, Hartford referred Winter's claim to another physician, Dr. Andrea Wagner. (R. 150.) Dr. Wagner reviewed Winter's medical records and concluded that they did not establish any condition or impairment that would render Winter

7

unable to work. (R. 185.) Relying in part on Dr. Wagner's conclusion, Hartford affirmed its termination of disability benefits on October 14, 2004.

**DISCUSSION**

Summary judgment is appropriate if the evidence shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The parties agree that the Court must review Hartford's denial of Winter's claim under the arbitrary and capricious standard. The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Trombetta v. Cragin Fed. Bank of Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). The Court may only overturn the administrator's decision if it is "downright unreasonable." *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999) (quoting *Butler v. Encyclopedia Brittanica, Inc.,* 41 F.3d 285, 288 (7th Cir. 1994)). Furthermore, the Court's review is limited to the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection*, 195 F.3d 975, 981-82 (7th Cir. 1999).

In the instant action, Hartford had a rational basis to deny Winter's claim. Dr. Oh concluded unequivocally that Winter was able to work as a human resources manager, and Dr. Gmeiner found that Winter did not "have any objective findings on her physical examination that would indicate a need for vocational or avocational restrictions." (R. 348,

8

426, 483.) Furthermore, Dr. Gelfman told Hartford that Winter could return to "lighter duty" work in a "low stress environment." (R. 320.) Dr. Varvil-Weld, PhD, also found no limitations on Winter's ability to work based on depression or any other mental condition. (R. 296.) And finally, both Dr. Lyons and Dr. Wagner reviewed Winter's medical records and concluded that she is capable of performing the her job. (R. 185-86, 254.) Accordingly, based on the opinions of these five medical doctors and one pychologist, it appears that Hartford's determination that Winter could perform the essential duties of her occupation was not "downright unreasonable."

Winter raises several objections. First, she contends that Hartford failed to give sufficient weight to Dr. McCartney's opinion that she could not work as a human resources manager. Furthermore, Winter argues that Hartford did not consider Dr. Lerner's opinion that because of her intermittent headaches, she would be unreliable to work on a daily basis. While these opinions certainly were a weight in favor of her claim, Hartford's decision need not be supported by the overwhelming weight of the evidence. The only question is whether Hartford's decision was arbitrary and capricious, and the fact that one physician's opinion conflicted with the view of another is not sufficient to overturn Hartford's decision. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

It was reasonable for Hartford to not rely entirely on Dr. McCartney's and Dr. Lerner's opinions. Dr. McCartney's opinions were contradictory, because he told Dr. Lyons at one point that Winter could perform full-time sedentary demand work, which contradicted

9

his earlier assessment. (R. 242-243.) Furthermore, when Dr. McCartney's supported Winter's disability claim in August 2003, there was no indication at that time that he made any attempt to measure Winter's actual functional capacity before rendering his conclusion. (R. 258.)

As for Dr. Lerner's conclusion that Winter would be unreliable at her job, it was not based on any objective measurement of her functional capacity. Most measurements of Winter in Dr. Lerner's physical examination were within normal limits, and only a few were "moderately restricted." (R. 217-218.) Accordingly, it was not "downright unreasonable" to afford greater weight to the other physicians who found that Winter was capable of working her job over the opinions of Dr. McCartney and Dr. Lerner.

Winter also contends that the timing of Dr. Oh's opinion precludes Hartford's ability to rely on it. Dr. Oh opined on June 3, 2002, that Winter could perform her job. Approximately nine months later, on March 7, 2003, Hartford approved Winter's claim for long-term disability. Subsequently, after receiving additional medical evidence, Hartford denied her claim. Winter argues that because Dr. Oh issued his opinion before Hartford approved her claim, it is unreasonable for Hartford to now rely on Dr. Oh's opinion to deny her claim.

Winter is wrong. While Hartford granted Winter's claim in March 2003, Hartford only approved benefits through April 4, 2003, at which time it would have additional information from Dr. Gelfman. The physical capacities evaluation form that Dr. Gelfman

10

returned to Hartford indicated that Winter was able to perform several of the tasks that are required of a human resources manager. In other words, Dr. Gelfman's evaluation confirmed Dr. Oh's original opinion that Winter was able to work as a human resources manager. Winter cites no case law or regulation that precludes Hartford from later giving more weight to a physician's opinion when subsequent evidence confirms that doctor's opinion. Hartford did not error, therefore, by relying on Dr. Oh's evaluation.

Winter raises the additional argument that Hartford improperly required objective evidence of her pain, instead of relying on her description of her pain. Yet, Hartford never required objective proof of her pain. Rather, Hartford requested objective evidence showing her inability to work. Requiring such evidence in support of a disability claim is not arbitrary and capricious. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322-23 (7th Cir. 2007).

Winter also argues that because the employer of Dr. Lyons and Dr. Wagner receives significant business from Hartford to review insurance claims, the Court should take into account the potential of bias on their part. The Court will not do so. There is no evidence indicating that Dr. Lyons or Dr. Wagner had an incentive to find that Winter was capable of working; indeed, the record supported their conclusion. As the Seventh Circuit recognized, "most insurers are well diversified, so that the decision in any one case has no perceptible effect on the bottom line," and thus "there is correspondingly slight reason to suspect that they will bend the rules," absent suspect circumstances such as "an insurer or plan administrator pay[ing] its staff more for denying claims than for granting them." *Mote v.*

11

*Aetna Life Ins. Co.*, 502 F.3d 601, 608 (7th Cir. 2007) (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)). Winter provided no evidence showing that Dr. Lyons or Dr. Wagner had such an incentive, so the Court will not disregard their opinions due to a potential bias.[1]

Finally, Winter argues that Hartford failed to accord Winter's award of Social Security disability benefits appropriate weight. Hartford considered the ruling of the Social Security Administration ("SSA") by asking Dr. Wagner to review the SSA's decision, but the SSA did not acknowledge or explain how its decision was consistent with Dr. Gmeiner's examination report, Dr. Gelfman's physical capacities evaluation form of April 2003, or Dr. Oh's conclusion that Winter could perform her occupation. While the Court may consider a SSA determination as relevant, such a decision is only binding if an ERISA plan specifically includes SSA disability as a condition of plan disability. *Mote*, 502 F.3d at 610. The Plan did not include any provision regarding SSA decisions in its policy, and Hartford's decision to rely upon evidence that indicated Winter could perform her job – evidence that the SSA failed to acknowledge – was not "downright unreasonable."

---

[1] Hartford filed a motion to strike evidence that Winter submitted in support of her motion for summary judgment. Some of that evidence was in support of Winter's argument that Dr. Wagner may be biased in her assessment. The Court denies the motion to strike and considered the evidence Winter submitted. Nevertheless, the evidence was not sufficient to demonstrate that Hartford was arbitrary and capricious by relying on Dr. Wagner's assessment.

12

Hartford's decision to deny benefits was not arbitrary and capricious, and as such, its motion for summary judgment is granted.[2]

---

[2] Winter also filed a "motion for judgment in her favor" because Hartford did not file a response brief to her motion for summary judgment. Instead, Hartford filed a motion to strike. While Hartford should have followed the briefing schedule of the local rules, Hartford was able to sufficiently demonstrate that it was entitled to summary judgment on its motion. Accordingly, the Court will deny Winter's "motion for judgment in her favor." *See Tobey v. Extel/JWP Inc.*, 985 F.3d 330, 332 (7th Cir. 1993) (finding that failure to respond to a summary judgment does not automatically result in judgment against the non-moving party).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Defendants' Motion for Summary Judgment (Docket No. 29) is **GRANTED**.

Winter's Motion for Summary Judgment (Docket No. 35) is **DENIED**.

The Defendants' Motion to Strike (Docket No. 38) is **DENIED**.

Winter's Motion for Judgment in Her Favor (Docket No 47) is **DENIED**.

The clerk is directed to enter judgment and close this case accordingly.

Dated at Milwaukee, Wisconsin this 1st day of July, 2008.

                              **BY THE COURT**

                              *s/ Rudolph T. Randa*
                              **Hon. Rudolph T. Randa**
                              **Chief Judge**